# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| United States of America ex rel. | ) | |
|   TIMOTHY MOBLEY, | ) | |
| | ) | |
|       Petitioner, | ) | |
| | ) | |
|       v. | ) | No. 09 C 0516 |
| | ) | |
| MICHAEL P. ATCHISON, Warden, | ) | Judge Rebecca R. Pallmeyer |
|   Menard Correctional Center, | ) | |
| | ) | |
|       Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Following a 1994 jury trial in the Circuit Court of Cook County, Timothy Mobley (hereinafter, "Petitioner") was convicted of the first-degree murder and aggravated kidnaping of nineteen year-old Kristin Ponquinette, for which he was sentenced to consecutive terms of ninety years and five years, respectively. Having exhausted his state court remedies, Petitioner now seeks habeas corpus relief, arguing that his trial counsel was ineffective in a number of ways; that the trial court erred in allowing certain testimony; that the evidence was insufficient to support his conviction; and that his sentence was an abuse of discretion. For the reasons set forth herein, the court denies relief.

## FACTUAL BACKGROUND[1]

The murder of Kristin Ponquinette unfolded on the evening of April 17, 1992. Carin Smith testified that on that night, she and her friend Sharon Burke went to Cassandra Butler's house at 127th and Union in Chicago, Illinois. (Direct Review Order, *People v. Mobley*, 1-94-4206 (Ill. App. Ct. 1st Dist. Mar. 27, 1999), Ex. A to Answer, at 4; Trial R., Ex. B to Answer, at J-34.)

---

[1] This court adopts the facts set forth in the Illinois appellate court opinion, *People v. Mobley*, 1-94-4206 (Ill. App. Ct. 1st Dist. Mar. 27, 1999). (Direct Review Order, Ex. A to Answer, 2-9.); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.").

Smith had never met Butler or Ponquinette and did not know why Ponquinette was at Butler's house. (Trial R. at J-35.) Smith testified that when she and Burke arrived, Ponquinette attempted to leave the house, but Burke blocked the door and told Ponquinette that she could not leave. (*Id*. at J-36.) Burke and Butler ordered Ponquinette down to the basement, where Burke slapped her repeatedly before she and Butler took turns cutting off Ponquinette's hair (Smith did not participate). (*Id*. at J-38-41.) According to Smith, Burke and Butler wanted to know "why [Ponquinette] had come around there and who she had been sleeping with." (*Id*. at J-39.) After cutting Ponquinette's hair, Burke and Butler bound her hands behind her back, stuffed a sock in her mouth, and forced her into a closet. (*Id*. at J-42-43.)

Smith and Burke then left Butler's house but returned soon afterwards when Smith realized that she had left her keys there. (Direct Review Order at 4.) Smith testified that when she returned to the Butler home, she encountered Butler, Venus Becom, Chezeray Moore, and three other men later identified as Amotto Jackson, Daniel Butler, and Terrence Mobley (Petitioner's brother) in the basement with the still-bound and gagged Ponquinette. (*Id*.; Trial R. at J-72-73.) Shortly after Smith and Burke arrived, the four men left the house with Ponquinette, leaving Smith, Cassandra Butler, Burke, and Becom behind. (Direct Review Order at 4.) Soon afterwards, Smith stated, Sonya Richardson and "Poopoo," later identified as Lashanda Wilson, arrived. (*Id*.; Trial R. at L-9.) Cassandra Butler announced that "the guys" had taken Ponquinette, prompting Becom, Richardson, and Wilson to leave and look for them, while Smith returned home. (*Id*.)

Venus Becom also provided key testimony against Petitioner at his trial. Becom testified that when she left the Butler home with Richardson and Wilson, they went to Chezeray Moore's garage where they found Moore, Jackson, and Ponquinette. (Trial R. at J-81-82.) According to Becom, Richardson and Ponquinette argued about Ponquinette's sexual conduct. (*Id*. at J-82.) Wilson, who also testified at Petitioner's trial, stated that Richardson beat Ponquinette's knees and feet with a lead pipe. (*Id*. at L-14.) Richardson then directed Becom to summon "the brothers"

2

from a nearby school playground so that Ponquinette could be forced to perform a sex act on them. (*Id*. at J-82.) At trial, Becom explained that "the brothers" referred to male members of the Blackstones street gang, of which Becom had been a member for several years. (*Id*. at J-83-84.) At trial, Becom identified Henry Lovett, Terrence Mobley, Dan Butler, Mandel Butler, Chezeray Moore, Joseph Harding, and Petitioner as "brothers" in April 1992. (*Id*.)

Complying with Richardson's request, Becom went to the Nansen School playground, about a half a block from Moore's garage, where she spoke with Mandel Butler and "Duke," whose real name is Carl Carpenter; she could not recall who else was there. (*Id*. at J-95, J-165.) A short time later, Becom returned to Moore's house just as Moore's mother ordered all the youths out of the garage. (Id. at J-96.)

Richardson, Wilson, Moore, Jackson, and Becom, who pulled the limping Ponquinette along, left the Moore residence. (*Id*. at L-16.) The group proceeded to the Nansen School playground where, Becom testified, she and Richardson again hit and kicked Ponquinette because Becom suspected that Ponquinette was having sex with Becom's boyfriend. (*Id*. at J-98.) After roughly five minutes, Petitioner broke up the fight. (*Id*.) Jackson picked Ponquinette up from the ground and walked away with her. (*Id*. at J-99-100.) Becom testified that she heard Petitioner, who was standing about five feet from her with Moore and Daniel and Mandel Butler, tell the other men: "[S]he knows too much already about one service, we have to get rid of her, kill her or something, get her away from around here." *(Id*. at J-100.) Becom also testified that Petitioner was referring to Ponquinette when he said "she" and "her." (*Id*. at J-101.) Becom then left the playground and returned to her house. (*Id*.)

At trial, Becom also described the structure of the gang and ranks within it. According to Becom, Petitioner, a higher-ranking member, had authority to issue orders to lower-ranking members, and he, along with his brother Terrence, had the power to "run" the neighborhood. (*Id*. at J-88, J-92-93.) Becom explained that gang-related meetings are called "services" and that these

3

"services" were often held at an old railroad bridge known as "Black Bridge."[2] (*Id*. at J-86-87.) She explained that she gained this knowledge over the three to five years of her Blackstone affiliation and that she had attended "a lot" of services. (*Id*. at J-84, J-103.)

Another Blackstone gang member, Carl Carpenter, was also present at the schoolyard that night, although he was uninvolved in the beating and subsequent murder of Ponquinette. On May 14, 1992, the police interviewed Carpenter at his home. (*Id*. at J-161.) Carpenter signed a statement saying that on the evening of April 17, 1992, he heard Petitioner say, "Kill the bitch" to a group of young men in the Nansen schoolyard. (*Id*. at J-166-170.) But at Petitioner's trial, Carpenter testified that he never actually heard Petitioner utter those words and that he just told the police what they wanted to hear. (*Id*. at J-168-69.) Carpenter also admitted that he was still a member of the Blackstone gang. (*Id*. at J-171.)

Lloyd Bryant, a member of another gang aligned with the Blackstones, testified that on a Friday evening in April 1992, he was driving his car near the playground when he stopped to talk with Petitioner.[3] (Trial R. at J-187, J-209.) At Petitioner's request, Bryant drove Petitioner to a

_____

[2]     "Black Bridge" appears to be a colloquial, rather than the official, name for the abandoned railroad bridge that crosses the Cal-Sag Channel just east of Halsted Street. *See People v. Jackson*, 281 Ill. App. 3d 759, 762, 666 N.E.2d 854, 858 (1st Dist. 1996) (opinion affirming the conviction of Amotto Jackson for Ponquinette's murder that included a description of the "Black Bridge").

[3]     In discussing Bryant's testimony, the court refers predominantly to testimony Bryant gave before a grand jury on May 15, 1992, in conjunction with the investigation of Ponquinette's murder. (Trial R. at J-200.) At Petitioner's trial, when Bryant was called as a witness by the state to reprise his grand jury testimony, he claimed to have no memory of many of the statements he made before the grand jury or the facts underlying those statements. (*See, e.g.*, *Id*. at J-200, J-201, J-203.) Nevertheless, Bryant's grand jury testimony is admissible as direct evidence under Illinois law, which provides that an out-of-court statement is not made inadmissible by the hearsay rule where:

(a)     the statement is inconsistent with his testimony at the hearing or trial, and
(b)     the witness is subject to cross-examination concerning the statement, and
(c)     the statement–
        (1) was made under oath at a trial, hearing or other proceeding
        . . .

nearby liquor store, where Petitioner exited the car and spoke to a couple of people, including Henry Lovett. (*Id*. at J-191.) Petitioner and Lovett then returned to Bryant's car and, again, at Petitioner's request, Bryant drove them to a bridge located at 129th Street and Halsted Avenue. (*Id*.) Lovett exited the car and walked toward the bridge, but returned a few minutes later and reported back to Petitioner that that "he" was "not there." (*Id*. at J-196.) Bryant then drove the men further east on 129th Street, parking near the corner of 129th and Eggleston Place, where Petitioner and Lovett exited the car and walked toward the Black Bridge. (*Id*. at J-197, J-198.) At some point during the car ride, Bryant asked Petitioner, "[W]hat is up[?]" and Petitioner replied, "Nation business," which Bryant took to mean Blackstone business. (*Id*. at J-201.) At trial, Bryant claimed that he gave some of his statements before the grand jury at the express instruction of the prosecutor–an assertion that Assistant State's Attorney Michael Baumel denied under oath. (*Id*. at J-200-04, J-207-13, M-93.)

Lashanda Wilson testified that, although she initially helped Becom and Richardson beat Ponquinette, she and Richardson walked away, with brothers Daniel and Mandel Butler, when Becom began kicking Ponquinette. (Trial R. at L-16-17.) Wilson reported being on the other side of the schoolyard, walking toward Harold's Chicken Shack with Richardson and the Butler brothers,

---

725 ILCS 5/115-10.1 (2011); *see also People v. Harvey*, 366 Ill. App. 3d 910, 921, 853 N.E.2d 25, 34 (1st Dist. 2006) (finding witnesses' grand jury testimony properly admitted where (1) their trial testimony "greatly differed" from their grand jury testimony; (2) they were available for cross-examination; and (3) the grand jury testimony was given under oath at a judicial proceeding).

Moreover, "[t]he prior testimony need not directly contradict testimony given at trial to be 'inconsistent' . . . [it is sufficient that it] includes evasive answers, silence or changes in position." *People v. Martinez*, 348 Ill. App. 3d 521, 532, 810 N.E.2d 199, 210 (1st Dist. 2004) (citations omitted). In other words, Bryant's trial testimony that he did not remember much of his grand jury testimony, or the underlying facts, is sufficiently evasive or different to be considered "inconsistent." Thus, because he was available for cross-examination at trial and his grand jury testimony "was taken under oath at a judicial proceeding," the trial court properly admitted Bryant's grand jury testimony as direct evidence under 725 ILCS 5/115-10.1.

when Jackson intervened between Becom and Ponquinette.[4]  About thirty minutes later, Wilson

and Daniel Butler returned to the playground and, finding no one there, began walking in the

direction of the Black Bridge.  (*Id*. at L-20-22.)  Along the way, they encountered Amotto Jackson

who, according to Wilson, laughed and announced that he was going to locate a sewer cover.

(*Id*. at L-21.)  Wilson and Daniel Butler continued toward the bridge where they encountered Moore

and Lovett.  (*Id*. at L-22.)  Wilson saw Ponquinette "laying [sic] on some railing" with her feet and

hands still bound.  (*Id*. at L-23.)  Wilson testified that Moore told her, "We hit the bitch in the head

with a brick and she still wouldn't die."  (*Id*.)  Lovett warned Wilson and Daniel Butler that they

should leave if they did not want to see what was about to happen.  (*Id*. at L-24.)  Wilson and Butler

turned back the way they had come and along the way, they passed Jackson, who was carrying

a sewer cover.  (*Id*. at L-25.)  Wilson and Daniel Butler then walked to a bus stop where they

happened upon Mandel Butler and Richardson.  (*Id*. at L-26.)  A few minutes later, Wilson testified,

Moore, Lovett, and Jackson walked up to the bus stop; Jackson "was laughing and jumping up and

down," Lovett looked "sad," and Moore "was smiling and laughing."  (*Id*.)

Almost ten days later, on April 26, 1992, Gary Kmetty, a petty officer in the United States

Coast Guard, was called to remove a body—later identified as that of Kristin Ponquinette—from

the Cal Sag Channel.  (Direct Review Order at 2-3.)  Kmetty testified that Ponquinette's hands were

tied together and her feet were bound with green wire.  (*Id*.)  A member of the Illinois state police's

underwater search and recovery team, Detective Tassos Kachiroubas, also discovered green wire

tied to a sewer cover he helped fish out of the Cal Sag Channel near the Black Bridge.  (*Id*. at L-62,

---

[4]      The court notes that this testimony appears to conflict with Becom's testimony in
several ways.  First, while Becom testified that Petitioner intervened and stopped her beating of
Ponquinette, Wilson stated that Jackson was the intervener.  Second, Becom testified that the
Butler brothers were part of the group discussion, which took place after the Becom-Ponquinette
fight ended, in which Petitioner gave the order to have Ponquinette killed; Wilson testified that the
Butler brothers left the schoolyard with her and Richardson *before* Becom stopped kicking
Ponquinette.

L-67, L-73-75.)

After the State charged Petitioner with Ponquinette's murder, he entered into a plea agreement which required him to testify against Moore, Jackson, and Lovett, as well as in another unrelated case. (Trial R. at C000044-45.) In exchange for his cooperation, the State agreed to recommend a twenty-year sentence on his behalf. (*Id*. at C000044.) Pursuant to the agreement, Petitioner signed a written statement admitting: (1) that when Mandel Butler said he wanted Ponquinette killed, he responded, "'If you're going to kill her, then just kill her"; (2) that he went to the Black Bridge shortly after leaving the schoolyard to make sure the others "took care of business"; (3) that once at the bridge with Lovett, Moore, and Jackson, Jackson told him that he intended to tie Ponquinette to a sewer cover and throw her in the river; and (4) that he retrieved wire and rope from his house and told Lovett to deliver it to Moore and Jackson. (*Id*. at C000053-55.) While Petitioner did testify in the unrelated case, he ultimately refused to testify against his friends, thereby forfeiting any benefit of his plea agreement and compelling the State to commence prosecution.

Petitioner's trial took place in April 1995. At the conclusion of the State's case, the defense rested without presenting any evidence. (Direct Review Order at 9.) The court denied Petitioner's motion for a directed verdict and submitted the matter to the jury. *Id*. After deliberating for two hours, the jury found Petitioner guilty of first-degree murder and aggravated kidnapping. (Trial R. at N-106.) At sentencing on July 20, 1995, the trial court described Ponquinette's murder as "exceptionally brutal and heinous," "indicative of wanton cruelty," and "shockingly evil." (*Id*. at O-40.) The court also stated that there was no doubt that Ponquinette was tortured "almost from the very beginning." (*Id*.) The court sentenced Petitioner to an extended-term sentence of ninety years for first-degree murder and to an additional five years imprisonment, to be served consecutively,

for aggravated kidnaping.[5]  (*Id*. at O-41-42.)

## PROCEDURAL HISTORY

On direct appeal to the Illinois appellate court, Petitioner challenged his conviction on the following grounds:

(i)     The trial court erred in allowing testimony of Ponquinette's father;

(ii)    The trial court erred in allowing Becom to testify as to the meaning of "she" and "her" in Petitioner's out-of-court statement;

(iii)   The trial court erred when it allowed Becom to testify regarding the structure of the gang;

(iv)    The trial court erred in admitting evidence of Petitioner's gang membership;

(v)     Trial counsel provided ineffective assistance when he failed to object to Becom's testimony regarding the meaning of "she" and "her" in Petitioner's out-of-court statement;

(vi)    Petitioner's guilt was not established beyond a reasonable doubt; and

(vii)   Petitioner's sentence was an abuse of discretion.

(Br. and Arg. for Def. Appellant, *People v. Mobley*, No. 1-94-2406, Ex. C to Answer.)  The Illinois appellate court affirmed the convictions and sentences.  (Direct Review Order at 22.)

Petitioner then filed a petition for leave to appeal ("PLA") to the Illinois Supreme Court. His PLA raised the same claims presented to the appellate court (listed above) and three new ones: that trial counsel was also ineffective because he failed to interview other witnesses from the schoolyard, to impeach Bryant's grand jury testimony, and to investigate the stab wound on the victim's lower back.  (*People v. Mobley*, PLA No. 84847, Ex. E to Answer.)  On April 1, 1998, the Illinois Supreme Court issued an order denying the PLA.  *People v. Mobley*, 177 Ill. 2d 580, 698 N.E.2d 546 (Ill. 1998).

---

[5]     As for the fates of Moore, Lovett, and Jackson, it appears that they were convicted and sentenced to jail terms of 100 years, 105 years, and life plus 15 years, although the record is unclear as to which defendant received which sentence. (*See* Trial R. at O-35.)

**Post Conviction Proceedings**

On September 8, 1998, Petitioner filed a petition for post-conviction relief raising only one claim—that his trial counsel, Leo Fox, was ineffective for failing to investigate, interview, and present potentially exculpatory witnesses. (Pet. for Post-Conviction Relief, *People v. Mobley*, No. 92 CR 13556 (Sept. 8, 1998), Ex. G to Answer.) Petitioner attached to his petition the affidavits of Mandel Strawter,[6] Terrence Mobley, Aneisha Pickett, Cecilia Smith, and Daniel Butler (hereafter "Affiants"). (*Id*. at 25-30.) They each stated that they were standing with Petitioner on the playground on April 17, 1992, and that they did not hear Petitioner tell anyone to kill or "get rid of" Ponquinette. (*Id*.) In fact, Terrence Mobley stated that "[he] 'heard' Mandel say . . . take [Ponquinette] to the [b]ridge and kill her . . . ."[7] (*Id*. at 27.) Petitioner insists that, had his attorney properly investigated and presented the testimony of the Affiants, the jury would not have convicted him.

The circuit court dismissed the petition as "frivolous and patently without merit" and noted further that the petition was not timely filed. (*People v. Mobley*, P.C. 92 CR 13556-04 (Ill. Cir. Ct. Nov. 2, 1998), Ex. I to Answer, at C000071). The court observed that, with the exception of Terrence Mobley, all of the other Affiants had given detailed accounts of the events of April 17, 1992, to the police; trial counsel was aware of these statements and was entitled to decline to call these witnesses as part of his trial strategy. (*Id*. at C000069.) The court also noted that, as part of the plea agreement Petitioner ultimately breached, Petitioner admitted issuing the order to kill Ponquinette; Fox would have been well aware of this statement and the State's ability to use it at trial for impeachment purposes. (*Id*. at C000070.) Because Petitioner's admission largely

---

[6]      Mandel Strawter is the same person as Mandel Butler. The record does not explain which last name is his legal name.

[7]      It is unclear why Terrence Mobley put the word "heard" in quotation marks in his own affidavit.

corroborated the state's evidence at trial and contradicted the testimony Petitioner now insists should have been presented, his counsel may have declined to call the Affiants to present what was likely to be perjured testimony, explained the court. (*Id*.)

Upon Petitioner's appeal, however, the Illinois appellate court reversed and remanded to the trial court for an evidentiary hearing. (First Post-Conviction Appellate Order, *People v. Mobley*, 1-98-4360 (Ill. App. Ct. 1st Dist. Dec. 26, 2000), Ex. L to Answer.) After finding that the petition was not time-barred (*id*. at 14), the court held that the failure of Petitioner's trial counsel to interview the Affiants, or to call them as witnesses, appeared to fall below an objective standard of reasonableness and to prejudice Petitioner.[8] (*Id*. at 16-17.) The court stated that, notwithstanding the lower court's opinion, nothing in the record explained why the trial counsel declined to interview and call the Affiants, and the failure to do so could well have amounted to ineffective assistance of counsel. (*Id*.) The appellate court remanded with instructions for the trial court to hold a hearing on Petitioner's ineffective assistance claim.

Accordingly, the trial court heard testimony and argument on several dates between April and June 2005. The court heard testimony from a number of witnesses including Petitioner, Aneisha Pickett, Cecilia Smith, and Jonathan Fox, the son of Petitioner's trial counsel, Leo Fox.[9] (*See* Post-Conviction R., Ex. P to Answer.) Calvin Burke, the brother of Sharon Burke, testified

---

[8]     The appellate court stated that "Fox's performance was so deficient that it fell below an objective standard of reasonableness" and "prejudiced [Petitioner], denying [Petitioner] a fair trial," before remanding the matter to the trial court with instructions to hold an evidentiary hearing regarding Petitioner's ineffective assistance claim. (First Post-Conviction Appellate Order at 16, 17, 19.) Although the court's statements concerning Fox's performance appear unequivocal, the subsequent procedural history of the case demonstrates that the remand was for further inquiry; thus, the appellate court ordered an evidentiary hearing to further investigate Petitioner's claim rather than a new trial.

[9]     Petitioner's trial counsel, Leo Fox, had since died and was unable to testify on his own behalf. His son Jonathan, a law school student at the time of Petitioner's trial, sat at Petitioner's table and served as an assistant to counsel for the duration of the trial. (Second Post-Conviction Appellate Order, *People v. Mobley*, 1-06-0349 (Ill. App. Ct. 1st Dist. June 30, 2008), Ex. U to Answer, at 7.)

that he saw Daniel Butler (deceased at the time of these proceedings) and an unknown, dark-skinned female push Ponquinette's body off the bridge. (Second Post-Conviction Trial Order, *People v. Mobley*, PC 92 CR 13556-04 (Ill. Cir. Ct. Oct. 19, 2005), Ex. Q to Answer, at 17.) The court also heard argument from the state and from counsel it appointed to represent Petitioner in the post-conviction proceedings on remand.

Ultimately, the post-conviction trial court denied the petition, rejecting not only Petitioner's ineffective assistance of counsel claim, but also several additional claims for relief that Petitioner added when the court granted him leave to amend his petition. (Second Post-Conviction Trial Order at 18.) Petitioner failed to persuade the court that Fox's decisions not to question potential jurors about their opinions toward gangs and not to request a conspiracy instruction constituted ineffective assistance of counsel. (*Id*. at 4-5.) Instead, observed the court, Fox acted consistently with his trial strategy (as evidenced by his opening and closing statements, the nature of his motions, and his manner on cross-examination) which was to prevent admission of evidence concerning the Blackstones and to distance Petitioner from the gang and from his co-defendants as much as possible. (*Id*.) Fox reasonably declined to call Daniel Butler as a witness, stated the court, knowing that Butler had already testified against Moore, Jackson, and Lovett. (*Id*. at 5.) Nor did Fox err in failing to impeach Butler's grand jury testimony which was not even used to indict or convict Petitioner. (*Id*. at 6.)

The court also rejected the claim that Fox's conduct fell below reasonable professional standards when he failed to personally interview or call as witnesses the Affiants, *i.e.*, the Petitioner's brother, girlfriend, and several close friends, all of whom were affiliated with the Blackstone gang. (*Id*. at 7-8.) The court reasoned that Fox had access to, and surely read, the detailed statements each of the Affiants had given to police,[10] and Fox likely concluded that any

---

[10] Only Terrence Mobley did not give a statement to police.

value from their testimony would have been minimal and outweighed by their obvious bias. (*Id*.) Indeed, Aneisha Picket and Cecilia Smith did testify at the evidentiary hearing (Petitioner called no other Affiants) and the court found their testimony vague and incredible. (*Id*. at 9.) Nor did the court believe much of Petitioner's own hearing testimony concerning his interactions with Fox and the prosecutors, describing him as "evasive and coy" and "not truthful." (*Id*. at 13.)

Finally, the court rejected the new argument, added to the amended petition and rooted in testimony by Calvin Burke, a man incarcerated with Petitioner, that Petitioner was innocent because Burke saw Daniel Butler and another woman push Ponquinette's body off the bridge. (*Id*. at 17.) The court noted that Burke's affidavit was prepared by Chezeray Moore, who was apparently working as a clerk in the prison law library while serving his time for Ponquinette's murder, and described Burke as "among the worst liars this court has ever viewed." (*Id*.) Therefore, the court found that Petitioner failed to make a substantial showing that his constitutional rights were violated and denied the petition for post-conviction relief. (*Id*. at 18.)

Petitioner appealed, arguing only that trial counsel was ineffective for failing to interview and call Smith and Pickett as witnesses, but the appellate court affirmed the denial of his petition. (Second Post-Conviction Appellate Order, *People v. Mobley*, 1-06-0349 (Ill. App. Ct. 1st Dist. June 30, 2008), Ex. U to Answer, at 12.) The appellate court observed that Smith and Pickett's testimony did not directly contradict Becom's testimony, as Petitioner had insisted it would, because Smith and Picket could testify only that they did not hear Petitioner give the order to kill Ponquinette—not that he did not say it. (*Id*. at 11.) Therefore, the court concluded, Smith and Pickett's testimony was not exculpatory; Fox's failure to call them did not prejudice Petitioner and thus, did not constitute ineffective assistance. (*Id*.) Petitioner filed a petition for leave to appeal with the Illinois Supreme Court, raising the same issue, but it was denied. *People v. Mobley*, 229 Ill. 2d 647, 897 N.E.2d 260 (Ill. Sept. 24, 2008).

On January 15, 2009, Petitioner filed the instant petition for writ of habeas corpus raising

nine claims:

(i)     Trial counsel was ineffective for failing to object to Venus Becom's opinion testimony concerning Petitioner's use of the words "she" and "her";

(ii)    Trial counsel was ineffective for failing to impeach Lloyd Jeffery Bryant;[11]

(iii)   Trial counsel was ineffective in failing to investigate and interview other potential defense witnesses present the night of Ponquinette's death;

(iv)    Trial counsel was ineffective in failing to investigate the cause of the victim's stab wound to her lower back;

(v)     Trial counsel was ineffective for failing to call Smith and Pickett as witnesses;

(vi)    The trial court erred in admitting Becom's opinion testimony regarding the meaning of "she" and "her" in Petitioner's statement;

(vii)   The trial court erred in admitting evidence of gang structure and of Petitioner's gang membership;

(viii)  The evidence at trial was insufficient to support convictions of both first-degree murder and aggravated kidnaping;

(ix)    The trial court abused its discretion in imposing an excessive sentence.

(Pet. for Writ of Habeas Corpus (hereinafter "Habeas Pet.") [8], No. 09 cv 516, at 2-29.)

## DISCUSSION

The Antiterrorism and Effective Death Penalty Act (AEDPA) limits the circumstances under which the court can grant habeas relief. The court will grant a writ of habeas corpus only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d); *Morgan v. Hardy*, 662 F.3d 790, 797 (7th Cir. 2011). Under the

---

[11]    Petitioner refers to Bryant as "Jeffery Bryant" in his petition. Bryant is generally referred to in the record as "Lloyd Bryant."

"contrary to" clause, a federal court may grant habeas relief only where the state court (1) applied a rule that "'contradicts'" Supreme Court precedent or (2) "reached a different outcome based on facts 'materially indistinguishable' from those previously before the Supreme Court." *Morgan*, 662 F.3d at 797 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). Under the "unreasonable application" clause, Petitioner must show that the state court unreasonably applied Supreme Court precedent in a context where it should not have been applied or unreasonably refused to apply the precedent where it should have been applied. *Id*. (citing *Virsnieks v. Smith*, 521 F.3d 707, 713 (7th Cir. 2008). A state court's application of a rule is acceptable if it is reasonable, even if the reviewing court finds the application to be "substantively incorrect." *Barrow v. Uchtman*, 398 F.3d 597, 602 (7th Cir. 2005) (citing *Williams*, 529 U.S. at 411-12.)

The court's ability to issue a writ of habeas is further limited by the exhaustion doctrine. Before a federal court can consider the merits of his claims, Petitioner must "exhaust the remedies in the court of the state." 28 U.S.C. § 2254(b)(1)(A). In that process, Petitioners must "'fairly presen[t] federal claims to the state court in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'" *Johnson v. Pollard*, 559 F.3d 746, 751 (7th Cir. 2009) (alteration in original) (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)). In order to satisfy this requirement, Petitioner must "fairly present" his claims through "'one complete round of the state's established appellate review process.'" *Byers v. Basinger*, 610 F.3d 980, 985 (7th Cir. 2010) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). In Illinois, that means that, in order to avoid procedural default, Petitioner must have presented each of his claims first to an appellate court and then to the Illinois Supreme Court in a petition for leave to appeal ("PLA"), either on direct review or in post-conviction proceedings. A claim is also considered procedurally defaulted where the state court decided the claim on adequate and independent state procedural grounds. *Gray v. Hardy*, 598 F.3d 324, 327-28 (7th Cir. 2010).

I.      **Ineffective Assistance of Counsel Claim**

Petitioner alleges that many errors by his trial counsel denied him his Sixth Amendment right to effective counsel.  To establish a violation of that right, Petitioner must satisfy the rigorous two-part test put forth in *Strickland v. Washington,* 466 U.S. 668 (1984).   Under *Strickland*, Petitioner must show that (1) counsel's representation fell below an objective standard of reasonableness and (2) he suffered prejudice as a result.   *Id*. at 687-88.   A petitioner suffers prejudice where there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.  In the habeas context, the federal court examines whether the state court's application of the *Strickland* standard was unreasonable; it does not determine, on its own, whether defense counsel's performance was deficient. *Harrington v. Richter,* ___ U.S. ___, 131 S. Ct. 770, 785 (Jan. 19, 2011).  "Surmounting *Strickland*'s high bar is never an easy task," *Padilla v. Kentucky*,   ___ U.S. ___,  130 S. Ct. 1473, 1485 (Mar. 31, 2010), but showing a state court's application of *Strickland* was unreasonable under § 2254(d)(1)  is an even harder one.  *Holman v. Gilmore*, 126 F.3d 876, 882 (7th Cir. 1997) ("*Strickland* builds in an element of deference to counsel's choices in conducting litigation [and] § 2254(d)(1) adds a layer of respect for the state court's application of the legal standard").

Petitioner alleges that multiple shortcomings and errors on the part of his trial counsel, Leo Fox, caused him to suffer prejudice and, consequently, violated his Sixth Amendment right to effective counsel.[12]  At the outset, the court notes that Petitioner is procedurally barred from alleging some of the facts that undergird this claim.  Petitioner argues here that Fox's performance was deficient, in part, because he failed (1) to impeach testimony given by Lloyd Jeffrey Bryant;

---

[12]      Petitioner lists multiple claims of ineffective assistance of counsel by Fox in his habeas petition.  The claim of ineffective assistance of counsel, however, "'is a single ground for relief no matter how many failings the lawyer may have displayed.'"  *Pole v. Randolph*, 570 F.3d 922, 934 (7th Cir. 2009) (quoting *Peoples v. United States*, 403 F.3d 844, 848 (7th Cir. 2005)).  This court will assess Fox's performance "as a whole."  *Id*.

(2) to investigate the cause of a stab wound to Ponquinette's lower back, and; (3) to interview other potential defense witnesses present the night of Ponquinette's death. Yet Petitioner did not "fairly present" these facts and arguments through one complete round of state court review. "Adequate presentation of a claim to the state courts requires the petitioner to present both *the operative facts and the legal principles that control each claim.*" *Pole*, 570 F.3d at 934-35 (emphasis added) (citing *Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007)). Here, Petitioner presented the "operative facts" related to the first two allegations only in his PLA on direct review. The facts related to Petitioner's third assertion—that Fox should have interviewed others present at the schoolyard the night of Ponquinette's death—also appear in the PLA on direct review, and in the initial pleadings in the post-conviction proceedings as well. But Petitioner's appeal and PLA in the post-conviction proceedings claimed ineffective assistance based only on Fox's failure to call Smith and Pickett as witnesses. Therefore, because Petitioner has not fairly presented the aforementioned factual bases for his ineffective assistance claim through one complete round of state court review, this court cannot consider them in its assessment of Fox's performance.[13]

Instead, the court reviews the state court's application of *Strickland* to Petitioner's claim that he suffered ineffective assistance because Fox failed to object to Becom's opinion testimony about the meaning of the words "she" and "her" in Petitioner's out-of-court statement and because Fox failed to call Smith and Pickett as witnesses at trial. Of these two claims, Petitioner fairly presented the former through one complete round of direct state court review and the latter through one

---

[13]    A habeas court may nevertheless review a procedurally defaulted claim if Petitioner can show cause for the default, and resulting prejudice, or demonstrate that failure to review the defaulted claim will result in a "fundamental miscarriage of justice." *Dellinger v. Bowen*, 301 F.3d 758, 764 (7th Cir. 2002) (citing *Rodriguez v. Scillia*, 193 F.3d 913, 917 (7th Cir. 1999)). Petitioner has not argued he was prevented from raising these claims earlier nor has he established a potential miscarriage of justice, *i.e.*, that it is "more likely than not that no reasonable juror would have convicted [Petitioner]" absent the error. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). Thus, Petitioner has offered no basis for finding an exception to the procedural default doctrine.

complete round of state court review in his post-conviction proceedings. On direct review, Petitioner alleged ineffective assistance because Fox failed to object to Becom's testimony that Petitioner's use of "she" and "her" referred to Ponquinette when he said, "[S]he knows too much already about one service, we have to get rid of her, kill her or something, get her away from around here." (Direct Review Order at 12-13.) The appellate court found that Fox's failure to object to Becom's opinion testimony did not constitute error because admission of the testimony was proper (as explained in greater detail below); thus, failure to object to the statement could not fall below reasonably objective professional standards. (*Id*. at 13-14.) This court cannot say that the Illinois appellate court unreasonably applied *Strickland* in its analysis on direct review.

In his post-conviction proceedings, Petitioner argued that Fox's failure to call Smith and Pickett as defense witnesses amounted to ineffective assistance. Petitioner insisted that Smith and Pickett's testimony—that they never heard Petitioner utter an order to kill Ponquinette—would have contradicted Becom's testimony and essentially exculpated him. On its review of the trial court's post-evidentiary hearing opinion, the Illinois appellate court held that, even if Fox's conduct fell below reasonable professional standards, Petitioner had not shown any prejudice. Smith and Pickett had an opportunity to present their allegedly exculpatory testimony at the evidentiary hearing before the trial court, but, as the appellate court noted, the trial court made it "absolutely clear that Smith and Pickett were not credible." (Second Post-Conviction Appellate Order at 11.) Moreover, Smith and Pickett could only testify that they did not hear Petitioner order Ponquinette's death, not that he never issued the order. Such testimony, explained the court, did little to exculpate Petitioner in light of the substantial evidence from which an inference of his guilt could be drawn. (*Id*. at 11-12.) Specifically, in addition to Becom's testimony, the appellate court cited Petitioner's presence at the schoolyard and, later that night, at the Black Bridge, as well as the fact that of the four men charged with Ponquinette's murder, only Petitioner had a rank high enough to order a murder. (*Id*.) Therefore, the appellate court concluded, any failure to call Smith and

Pickett as witnesses did not prejudice Petitioner. Nor can this court find it reasonably probable that, had Smith and Pickett testified, "the result of the proceeding would have been different." This court cannot say that the state appellate court unreasonably applied *Strickland* in its post-conviction review and must therefore reject Petitioner's claim for relief based on ineffective assistance of counsel.

## II.    Admission of Evidence

Petitioner also alleges that the trial court erred in admitting three different types of evidence: (1) Becom's statement that Petitioner was referring to Ponquinette when he said, "[S]he knows too much . . . we have to get rid of her, kill her . . . ."; (2) evidence of Petitioner's gang membership; and (3) evidence of gang structure and protocol. Because state court evidentiary rulings are a matter of state law, they will rarely serve as the basis for issuance of a writ of habeas corpus. *Haas v. Abrahamson*, 910 F.2d 384, 389 (7th Cir. 1990) (citation omitted). Petitioner must show that the probative value of the evidence was "so greatly outweighed" by its prejudice that its admission denied him his right to a fair trial under the Due Process Clause of the Fourteenth Amendment. *Brown v. Watters*, 599 F.3d 602, 616 (7th Cir. 2010) (quoting *Milone v. Camp*, 22 F.3d 693, 702 (7th Cir. 1994)). In other words, the evidence must be so prejudicial that it "'produced a significant likelihood that an innocent person has been convicted.'" *Anderson v. Sternes*, 243 F.3d 1049, 1053 (7th Cir. 2001) (quoting *Howard v. O'Sullivan*, 185 F.3d 721, 723-24 (7th Cir. 1999)).

First, Petitioner claims that the trial court erred in admitting Becom's testimony that Petitioner was referring to Ponquinette when he said, "[S]he knows too much . . . we have to get rid of her, kill her . . . ." On direct appeal, the Illinois appellate court first stated that Petitioner waived this issue "by failing to raise it below," but addressed the merits of the argument

nonetheless.[14]  (Direct Review Order at 12-13.)  The court stated that under FED. R. EVID. 701, a lay witness may testify as to opinions that are "rationally based on the perception of the witness" and "helpful to a clear understanding of the witness's testimony of a determination of fact."[15] (*Id*. at 13) (citing FED. R. EVID. 701).  The court reasoned that Becom's opinion as to the meaning of "she" and "her" in Petitioner's statement was an opinion rationally based on the conversation Becom overheard, especially in light of the events she witnessed in the park that night.  (*Id*.) Specifically, Becom had seen Ponquinette transported and  beaten in several locations before, at the schoolyard, Petitioner interceded to stop the beating, stating that they needed to "get rid of her" because "she" knew too much.  This court agrees that Becom's opinion as to the meaning of Petitioner's use of pronouns was a natural and logical conclusion based, not on scientific or specialized knowledge, but on a common understanding of basic verbal communication.  Moreover, the testimony was helpful to the determination of whether Petitioner issued an order to kill Ponquinette.  The admission of this testimony did not deny Petitioner a fundamentally fair trial as required by the Due Process Clause.

Nor did the trial court's admission of evidence regarding Petitioner's gang membership and the gang structure violate Petitioner's right to a fair trial.  The court agrees with Petitioner that

---

[14]    A federal court will not review a matter of federal law decided by a state court where the judgment rests on an adequate and independent state procedural ground and the state court "clearly and expressly" relied on that procedural ground in reaching its judgment.  *Moore v. Bryant*, 295 F.3d 771, 774 (7th Cir. 2002) (citing *Harris v. Reed*, 489 U.S. 255, 263-65 (1989)).  Here, although the state appellate court acknowledged Petitioner's waiver of the issue by failing to object to the admission of Becom's testimony at trial, it nevertheless addressed the merits of Petitioner's argument and held Becom's testimony regarding the meaning of "she" and "her" properly admitted. Therefore, because the state court did not "clearly and expressly" base its rejection of this claim on procedural grounds, this court may hear the claim.

[15]    At the time of Petitioner's appeal on direct review, Illinois had not yet compiled its own rules of evidence and relied instead on the Federal Rules of Evidence.  *See, e.g.*, *People v. Novak*, 163 Ill. 2d 93, 102 (Ill. 1994) ("Illinois courts refer to Rule 701 of the Federal Rules of Evidence in considering the admissibility of lay witness opinion.").  Under the Illinois Rules of Evidence adopted September 27, 2010, and effective January 1, 2011, Rule 701 is identical to Rule 701 of the Federal Rules of Evidence.  ILL. R. EVID. 701.

evidence of gang membership can be prejudicial to a defendant. Indeed, the Seventh Circuit has expressed concern that "the admission of gang evidence raises the specter of guilt by association or a verdict influenced by emotion." *United States v. Santiago*, 643 F.3d 1007, 1011 (7th Cir. 2011) (citing *United States v. Irvin*, 87 F.3d 860, 865 (7th Cir. 1996)). But at the same time, "the risk of prejudice associated with gang evidence does not render it automatically inadmissible." *Id.* To the contrary, gang affiliation is particularly relevant "'where the interrelationship among people is a central issue.'" *United States v. Alviar*, 573 F.3d 526, 536 (7th Cir. 2009) (quoting *United States v. Thomas*, 86 F.3d 647, 652 (7th Cir. 1996)).

Like the Seventh Circuit, the Illinois appellate court also noted the disconcerting potential for prejudice with gang-related evidence, but it nevertheless held the admission of such evidence in Petitioner's case "clearly relevant and admissible." (Direct Review Order at 16.) The court explained that evidence describing Petitioner's membership in the Blackstones, as well as the hierarchical structure of the gang, was directly relevant to the motivation for killing Ponquinette and to the import that Petitioner's statement would have had on his fellow gang members. (*Id.*) That is, evidence of Petitioner's gang membership is probative of the State's assertion that Petitioner wanted Ponquinette killed because she had too much information about the inner operations of the gang. Similarly, evidence of Petitioner's high rank in the gang—particularly as compared to Moore, Jackson, and Lovett— is probative of his ability to cause the killing of another simply by speaking. Understanding the "interrelationship" among the four men charged with Ponquinette's murder is essential to determining their individual culpability; evidence concerning their gang affiliation and rank bears directly upon that inquiry. While the court understands Petitioner's concern about the prejudicial nature of gang-related evidence, in this case, the admission of such evidence was relevant and highly probative of the State's case; therefore, its admission did not deny Petitioner a fair trial.

The court also rejects Petitioner's assertion that Becom did not have personal knowledge of the gang sufficient to lay a foundation for her testimony regarding gang structure. In contesting Becom's personal knowledge of gang hierarchy, Petitioner notes Becom's own admission that she was not allowed to participate in some gang meetings and she did not engage in decision-making on behalf of the gang. (Habeas Pet. at 6-7.) Thus, he argues, she did not have sufficient knowledge to testify about gang protocol. But, as the Illinois appellate court observed, Becom testified that she had been a member of the Blackstones and had known Petitioner for three to five years at the time of Ponquinette's murder. (Trial R. J-84, J-87.) She also stated that she was the higher ranking of the two females in the gang. (*Id*. at J-85.) Petitioner's counsel repeatedly objected to Becom's testimony on gang procedures based on her alleged lack of personal knowledge, but the trial court overruled his objections almost every time, reminding counsel that he would have an opportunity to cross-examine the witness. (*See, e.g.*, Trial R. at J-89, J-90, J-93.) When Petitioner's counsel did question Becom, she testified that she had, in fact, attended "a lot" of gang meetings over the years. (*Id*. at J-103.) On direct review, the Illinois appellate court found that these facts demonstrated that, from years of involvement in the gang, Becom had gleaned personal knowledge of the Blackstones sufficient to lay the foundation for the admission of her testimony. This court agrees. Thus, Petitioner has not shown that the admission of any of Becom's testimony—whether regarding gang affiliation and protocol or interpreting Petitioner's schoolyard statements—so greatly prejudiced Petitioner that it is significantly likely that he was wrongly convicted.

## IV.    Insufficient Evidence

Petitioner also alleges that the State failed to carry its burden of proving his guilt beyond a reasonable doubt. A challenge to the sufficiency of the evidence supporting a conviction is notoriously difficult to mount. The reviewing court considers whether, "'after viewing the evidence

in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Cavazos v. Smith*, ___ U.S. ___, 132 S. Ct. 2, at *6 (Oct. 31, 2011)  (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Here, the jury convicted Petitioner of first-degree murder and aggravated kidnaping on a theory of accountability.  Under Illinois law, a person commits first-degree murder where he kills someone without lawful justification, if "he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another."  720 ILCS 5/9-1 (2011).  A person commits aggravated kidnaping where he knowingly carries a person from one place to another, by force or threat of imminent force, with the intent to secretly confine, and inflict great bodily harm upon, the victim against his or her will.  720 ILCS 5/10-1 (2012); 720 ILCS 5/10-2 (2012).  Finally, a person may be found guilty of an offense based on a theory of accountability if "before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees or attempts to aid that other person in the planning or commission of the offense."  720 ILCS 5/5-2 (2010); *see also People v. Taylor*, 164 Ill. 2d 131, 140 (Ill. 1995) (upholding a first-degree murder conviction on accountability theory  where the defendant knowingly accompanied an armed man on a mission to kill another, stayed with the gunman after the killing, and fled only when the police arrived).

The Illinois appellate court recounted the facts that, when viewed in a light most favorable to the State, supported Petitioner's convictions: Becom testified that she heard Petitioner, a high-ranking gang member, tell his fellow gang members to kill or "get rid" of Ponquinette; Jackson carried Ponquinette to the Black Bridge, a site of the gang's meetings; Bryant dropped Petitioner off at Black Bridge shortly thereafter, and; Ponquinette's body was found by the bridge roughly ten days later.  (Direct Review Order at 19.)  This court notes, in addition, the fact that Wilson testified that she saw Moore, Lovett, and Jackson, sewer cover in tow, at Black Bridge with Ponquinette

where Moore told Wilson they hit Ponquinette in the head with a brick but she was still alive. (Trial R. at L-23-25.) Based on this record, Petitioner has not shown that the appellate court's application of the *Jackson* standard for review of the sufficiency of the evidence was unreasonable or contrary to precedent.

## V.    Sentencing

Petitioner argues that his consecutive sentences of ninety years for first-degree murder and five years for the aggravated kidnaping of the victim were excessive, especially given that the maximum sentence is one hundred years.[16]    (Habeas Pet. at 21.)  "The Constitution does not require strict proportionality between crime and sentence, [but] [r]ather forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (quoting *Solem v. Helm*, 463 U.S. 277, 288 (1983)); *see also Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (finding the state court's imposition of two consecutive sentence terms of twenty-five years to life for a "third strike" conviction on a $150 theft was not contrary to or an unreasonable application of the grossly disproportionate principle).  Federal habeas courts, however, generally do not review state court sentences that fall within the statutory limit. *Gleason v. Welborn*, 42 F.3d 1107, 1112 (7th Cir. 1994) (citation omitted).  A sentence at or below the statutory limit can be deemed disproportionate on habeas review only where the sentencing court abused its discretion. *Henry v. Page*, 223 F.3d 477, 482 (7th Cir. 2000) (citation omitted).

There is no merit to Petitioner's argument that the nature of his involvement in Ponquinette's murder requires a reduction in his sentence.  The fact that "[h]e never touched the victim" and did not premeditate her death (Habeas Pet. at 22.), does not require the judge to issue a sentence at the low end of the sentencing range.  Indeed, the judge reached a sentence toward

---

[16]    The court assumes that Petitioner is referring to the one-hundred-year maximum for an extended sentence for first-degree murder in Illinois.  *See* 730 ILCS 5/5-4.5-20 (2009) ("For first degree murder . . . [i]mprisonment shall be more a determinate term of . . . not less than 60 years and not more than 100 years when an extended term is imposed . . . .").

the high end of the range, because he determined that Ponquinette was tortured, a determination Petitioner also alleges was improper.

At the sentencing, the trial court described Ponquinette's murder as "exceptionally brutal," "indicative of wanton cruelty," and stated that there was no doubt she was tortured "almost from the very beginning."  (Trial R. at O-40.)  Because of those statements, Petitioner alleges that he was wrongly sentenced to an extended term based on the conduct of those who bound and beat Ponquinette before Petitioner ever got involved.   The trial court did not identify the specifics of Petitioner's involvement in the torture other than to say that he "set into motion the events" that culminated in Ponquinette's death.  (*Id*. at O-41.)  On direct review, the appellate court elaborated that a defendant convicted of first-degree murder on an accountability theory, as Petitioner was, can be sentenced to an extended term based on the "brutal and heinous behavior accompanying the offense." (Direct Review Order at 21.)  Ponquinette undoubtedly suffered "brutal and heinous" treatment after Petitioner ordered her killed: At a minimum, her killers hit her in the head with a brick, bound her hands and feet, and tied her to a sewer cover before pushing her off a bridge to drown in the river below.  The appellate court found that the trial court did not abuse its discretion in imposing the ninety-year extended term and this court cannot say that ruling was contrary to or an unreasonable application of the grossly disproportionate principle.

## CONCLUSION

For the reasons explains herein, the court denies Mobley's petition for a writ of habeas corpus.  In reaching this decision, the court did consider Petitioner's August 2011 submission; his motion for leave to file that submission [31] is granted *nunc pro tunc*.

The court declines to issue Petitioner a certificate of appealability, because he has failed to make "'a substantial showing of the denial of a constitutional right.'"  *Gonzalez v. Thayer*, ___ U.S. ___, 132 S. Ct. 641, 648 (Jan. 10, 2012) (quoting 28 U.S.C. § 2253(c)(2)); *see also Resendez*

*v. Knight*, 653 F.3d 445, 446 (7th Cir. 2011) (noting the Supreme Court's statement that such "a substantial showing" exists only where "reasonable jurists" could debate whether the petition should have been disposed of differently) (citing *Slack v. McDaniel*, 529 U.S. 476, 484 (2000)).

ENTER:

Dated: February 27, 2012

REBECCA R. PALLMEYER
United States District Judge